The defendants were held to bail under an order of arrest which was granted on a complaint, used as an affidavit, alleging in substance that the defendants contracted for the purchase of one car-load of commercial fertilizer from the plaintiffs and executed therefor their note for $416.25, agreeing at the time, and as a part of said contract of purchase, that they would deliver to the plaintiffs on or before the first of May following the notes of planters or other purchasers to whom they might sell said fertilizer for the gross amount of sales to be held by the plaintiffs as collateral security for the note of $416.25, and that they would hold all of said fertilizer, as also all proceeds therefrom in trust for the payment of said note, and that they would apply all proceeds of said fertilizer, as collected by them, to the payment of said note, whether the same should have matured or not, that the defendants refused to pay said note, or any part thereof, and failed and refused to deliver to the plaintiffs any notes of planters or other purchasers of said fertilizer, or to account with them in any manner for the proceeds of sales of said fertilizer, or to furnish them with a list of their sales of the same and their collections, that the defendants sold said fertilizer and fraudulently applied the proceeds of sale to their own use, and refused to account with the plaintiffs for the same, in (91) *Page 64 
violation of the confidence and trust reposed in them by the plaintiffs, and which they assumed, and that the plaintiffs would not have sold to the defendants said fertilizer unless they had agreed, as they did do, to deliver to them the said notes of planters or other purchasers, and to hold all proceeds of sale in trust for the payment of their said note to the plaintiffs.
The defendants, answering the complaint, admitted the contract as set out in the complaint, but averred that the plaintiffs waived all compliance with the terms of the contract as regards the forwarding to them of farmers' notes and of holding proceeds from all sales in trust; that no demand was made on them for said notes but once, and at that time they had taken but few of the notes, and so informed the plaintiffs; that the custom of defendants in such transactions was not to remit the proceeds from said sales to plaintiffs as collected, but to cover the same into their general fund and use in their business, and when their notes given to close said purchase became due to pay the same from any funds on hand; that the plaintiffs had knowledge of this custom, that they gave their consent to the same and acquiesced in such a disposition of the proceeds from said sale and notes; that no demand was made on them for a list of said sales until after 25 November, 1889, when they had assigned, and that then these defendants had been advised to take no steps in the matter until they had consulted an attorney; that all of said notes have been turned over to B. S. Gay, Esq., to be delivered to plaintiffs since such consultation, and all open accounts, liens and mortgages in which sales of such guano are included are in the hands of one S. N. Buxton, assignee of said defendant firm. They denied that they fraudulently applied the proceeds from such sales to (92) their own use, and as to the delivery of said notes and holding proceeds in trust they alleged that the same was not a material inducement to said contract, and that in so far as the defendants may have failed to comply with said terms such failure was with the consent of plaintiffs and acquiesced in by them.
On the trial the following issues were submitted to the jury:
1. Did defendants execute and deliver the note to the plaintiffs as alleged in the complaint?
2. Have any payments been made by defendants on said note, and in what amount, and when?
3. What amount is now due and owing plaintiffs on said note?
4. Have defendants, or either of them, and if so, which one, embezzled and fraudulently appropriated to their own use property held by them in trust for plaintiffs, or held by them as agents, etc., under the contract, and applicable to payment of plaintiff's debt?
To which issues the jury responded as follows: *Page 65 
To the first issue, "Yes," to the second issue, "Yes, $30, at beginning of suit," to the third issue, "$387.50 and interest," to the fourth issue, "Yes, as to W. C. Maddrey."
Plaintiffs introduced the contract entered into between themselves and the defendants in reference to the sale of the fertilizer furnished by them to the defendants, and also a note for $416.25, dated 22 May, 1889, and due 15 November, 1889, executed by defendants to plaintiffs, which covered the amount due for said fertilizer.
The plaintiffs next introduced the letters written by themselves to the defendants and the replies of the defendants thereto, from which it appeared that the plaintiffs had, from time to time, urged the defendants to comply with said contract by sending them the notes taken from farmers for the sale of said fertilizer, or any cash (93) collected from said sales, and that defendants had deferred compliance by saying that the farmers were so busy that they had delayed taking their notes, but would send them forward as soon as they were executed. Plaintiffs then rested.
Defendant W. C. Maddrey was introduced as a witness, and testified:
That defendants did not sell any of said fertilizer for cash, but sold to farmers on the idea that they would give their notes, the amounts were included with supplies sold them, and secured by mortgages, liens, etc.
That defendants made an assignment for the benefit of creditors on 29 November, 1889, to S. N. Buxton, trustee, who was an uncle of the witness, in which it was first provided that several judgments recently obtained against the defendants, amounting to about $3,500, should first be paid, and the debts due to Eure, Farrar Co., amounting to about $3,600, should be paid.
These plaintiffs were not secured in said assignment. Said assignment covered all the property of the firm and all the property, real and personal, of W. J. Maddrey, including all accounts and book accounts, and neither of defendants retained any of their homestead or personal property exemptions. The sheriff was present with executions on said judgments at the time said assignment was made. Witness further testified that their assets at the time of the assignment, consisting of debts due the firm and the firm's property, amounted to considerably more than their liabilities, and that in making the assignment defendants desired to thereby gain time to have the debts due them collected and to prevent their goods being sacrificed under a forced sale; that he thought that enough could be collected to pay all their debts, and that they could begin business again, that Judge Eure, the (94) secured creditor therein, had promised to advance the money with which to pay off the judgments in case they would secure him in the *Page 66 
assignment, and that time would then be gained for collecting their debts, etc.
That witness had not intended that any of the notes or accounts due the plaintiffs should go into the trustee's hands for the general creditors preferred, but that they should be applied directly to plaintiffs' debt, that the trustee had demanded all the books and accounts, as well as the goods, and had taken charge of them, that witness thought trustee was entitled to them, but would have to account for them as stated; that afterwards trustee delivered up the guano notes, but not the accounts, to witness and witness turned them over to Mr. Gay, his attorney, to be delivered to Mr. Mason, attorney for plaintiffs, that these notes amounted to $134; that this was done after the plaintiffs brought this action. Witness, before the assignment, had collected some amounts from farmers for the plaintiffs, and had turned it into his general business, that he had no intention at that time, or at any other time of defrauding plaintiffs, but expected to pay off their note executed to plaintiffs for the fertilizer when it should fall due, that this had been their custom in dealing with other fertilizer companies for whom they acted as agents upon the same terms as for the plaintiffs, and that they had always paid up before this year, that the crops of that year were the shortest ever known, and they made an utter failure in collecting debts, in some cases collecting not more than $100 when $500 was due, generally collecting about five cents in the dollar, and defendants lost all they had made.
Witness further testified that his codefendant, and father, W. J. Maddrey, had nothing to do with the management of the business, except in the way of advice.
There was testimony of other witnesses that the crops of 1889 (95) were the shortest ever known. S. N. Buxton, the trustee, was a large merchant, had been in business for several years, and was a large dealer in fertilizer, and had dealt in them on similar terms as defendants with plaintiffs.
Defendants' counsel proposed to ask him, as a witness for defendants, if he was in the habit of paying over funds received from sales of fertilizers before his own note therefor was due, and whether or not he kept the money received from sales of guano separate from his other funds derived from mercantile business, with a view to showing that he did not keep them separate, but used them in his general business and settled with the guano companies when his own note became due. The court refused to allow the question upon objection, and defendants excepted.
W. H. Ivey, testified after objection by defendants, that he had paid a note for $25.65 on 6 November, 1889, to defendants for guano sold *Page 67 
him by the defendant belonging to the Walton Whann Guano Company. This evidence was introduced by plaintiffs upon the question of intent with a view of showing a fraudulent disposition of other moneys under like contracts, the defendant W. C. Maddrey having testified already that his firm was selling fertilizers for said company in 1889 under a contract similar to that between the plaintiffs and themselves.
Defendants objected to the admission of this evidence. The objection was overruled, and defendants excepted. Ivey said he owed $200 for guano bought that year, still unpaid.
Other and similar testimony upon the question of intent was admitted under the objection of the defendants.
W. J. Maddrey testified that he took no active part in the business and knew nothing about it. W. J. Maddrey admitted that he used about $21 worth on his individual farm, and had not paid (96) plaintiffs for any part thereof, that it was charged to him on the books of the defendant firm. It was in evidence by W. C. Maddrey that about $125 of the fertilizers were sold for cash, and some sold on account and included in liens given by defendants' customers for advancements to be made.
The plaintiffs asked in writing, in due time, the following instructions, which were refused, and plaintiffs excepted, to wit:
1. If the jury believe the testimony of W. C. Maddrey, they will answer the fourth issue, Yes.
2. The fact that the year 1889 was a bad crop year ought not to enter into the consideration of the jury under the testimony in this case. (This prayer was asked in consequence of the fact that defendants' counsel had laid great stress upon the failure of the crops in 1889 as the reason why defendants failed to pay plaintiffs.) When the defendants entered into the contract which has been offered in evidence they assumed a relation of trust and confidence to the plaintiffs, and it was their duty to hold the sales of the fertilizers which they received from the plaintiffs, and if the jury shall find that they have failed or refused to discharge said trust and confidence, or have applied said sales to other uses, or appropriated them to their own use, then the jury will answer the fourth issue, Yes.
4. That nothing done by the defendants since the commencement of this action can enter into their consideration in arriving at their answer to the fourth issue.
5. If the jury shall find that the defendants were in strained circumstances, which soon ended in insolvency, and the jury shall further find that while they were in those strained circumstances they *Page 68 
(97) appropriated the property intrusted to them by the plaintiffs to their own use, then the law presumes that their intent was fraudulent in thus appropriating it, and they cannot be heard to say that they had no intent by such appropriation to defraud the plaintiffs.
The defendant asked the following instructions, which were given, and plaintiffs excepted, to wit:
1. The plaintiffs must allege and prove that the money was fraudulently misappropriated, and if they fail to prove the fraudulent intent at thetime the money was used in the general merchandise business, or otherwise, then they have failed to make out their case, and you should find the fourth issue, No.
2. It must be distinctly proved that the defendants have acted with a felonious intent and have made an intentional wrong disposal, indicating a design to cheat and deceive the plaintiffs, before the defendants can be found guilty of fraudulently appropriating any property of plaintiffs.
3. If at the time the defendants used any money that they may have collected for the plaintiffs they did not intend to defraud the plaintiffs, but intended to use it in their business, and to pay their notes when they should become due to the plaintiffs, then you should find the fourth issue, No.
The court further instructed the jury as follows, to wit:
The burden of the fourth issue is upon the plaintiffs. The defendants admit the appropriation to their own business of so much of the guano as they sold for cash (about $125), and the question turns upon whether the appropriation, either here or in making the transfer of other assets, was done with a fraudulent intent.
Plaintiffs excepted.
If such intent was absent the mere misappropriation with failure to repay would not inculpate, and the answer to issue four should (98) be, No.
Plaintiffs excepted.
The jury found the fourth issue, "No, as to W. C. Maddrey," and there was a judgment thereon vacating the order of arrest as to W. J. Maddrey, and taxing plaintiffs with costs incident to the proceedings in arrest as to said W. J. Maddrey.
Plaintiffs moved for a venire de novo as to W. J. Maddrey on the issue of fraud.
For alleged errors in admission of testimony and instructions to the jury both plaintiffs and defendants appealed.
The plaintiffs brought this action to recover of the defendant firm, W. J. Maddrey Son, a sum of money that they alleged was due to them from defendants, and which they had refused to pay. What amount was so due to the plaintiffs was ascertained at the trial to the satisfaction of both parties, it seems, for no objection is made to the judgment rendered so far as it declares the indebtedness of defendants to plaintiffs. These appeals concern, not the main action, but the ancillary remedy of "arrest and bail," the aid of which the plaintiffs invoked in order the better to secure the fruits of their recovery.
In Travers v. Deaton, 107 N.C. 500, it is said of paragraph 2 of section 291 of The Code: "This provision is plain and very comprehensive in its terms and purpose. It intends, certainly, to embrace all cases where the relation of trust and confidence in respect to money received by or personal property in the possession of one party for the benefit of another is raised and exists between such parties by reason of their contract, express or implied. The purpose is to give the more efficient remedy where the cause of action involves a breach of (99) trust on the part of the defendant sustaining a fiduciary relation to the plaintiff." In that case, as well as in the cases of Chemical Co.,v. Johnson, 98 N.C. 123, and Powers v. Davenport, 101 N.C. 286, it was decided that where between the plaintiff and defendant there was such a contract as in this case is admitted to exist between the parties, a fiduciary relation was created, and that a violation of such a contract by defendants was a breach of trust. Inasmuch, then, as this action is founded upon an alleged violation of such a contract — a breach of trust — it follows that the plaintiffs, having made proper affidavits and given the required undertaking, had a right to an "order of arrest" for the defendants.
According to the provisions of section 316 of The Code, as amended by Laws 1889, ch. 497, the following issue was submitted to the jury: "Have defendants or either of them, and if so, which one, embezzled and fraudulently appropriated to their own use property held by them in trust for plaintiffs, or held by them as agents, etc., under the contract, and applicable to the payment of plaintiffs' debt?" To this issue the jury responded "Yes, as to W. C. Maddrey," and the court refused to vacate the order of arrest as to W. C. Maddrey, and because of such refusal he appeals from that judgment, alleging error in the admission of testimony. We will first consider and dispose of his appeal.
The evidence, to the introduction of which he objected, tended to show that he had conducted himself, in his dealings with others towards whom he stood in the same relation as he did towards the plaintiffs, just as he had done toward them — that he had disposed of other property besides that of the plaintiffs in violation of the contracts under *Page 70 
(100) which he held it — that he had committed other breaches of trust similar to the one charged against him in this action and about the same time.
The record discloses the fact that the defendants were allowed, over the objection of the plaintiffs, to offer testimony to show that, when they did the acts complained of, they had no intent to defraud the plaintiffs, and it was in reply to that evidence as to intent that the plaintiffs offered the evidence to which the defendants objected. His Honor admitted it for that purpose only, and cautioned the jury to consider it on that question alone.
If the intent with which a trustee commits a breach of trust were at all material in such an inquiry as this, authorities might be found to sustain the ruling of which this defendant complains. But we need only say here that his intent was entirely immaterial. The law gives to a plaintiff, whose money or property has been put beyond his reach by his agent or trustee, by an act in violation of his duty, the remedy of arrest and bail, that he may the better compel his unfaithful agent or trustee to make amends for his unfaithfulness, and it "turns a deaf ear" to one who would excuse himself by asserting that he did not mean to do wrong when consciously doing that which was a breach of the trust reposed in him, or by alleging that he honestly believed that he would be able to replace the misapplied funds, so that no loss would eventually come to the plaintiff. Doing such wrong is, in such a case, incompatible with meaning to do right. The assertion of an intention to replace the fund is an admission of consciousness that its use was a misapplication. Good intentions do not at all lessen the wrongfulness of a breach of trust, or, rather, the law will not allow one to say that he violated its plain precepts with good intentions. Therefore, the ruling of which the defendant complains was harmless.
And, indeed, so far as the record discloses, there was no (101) evidence whatever introduced by the defendants to show any cause for the vacating of the order of arrest as to W. C. Maddrey. All the evidence went to show that he had committed a breach of trust, his conduct being judged by the principles established by the cases cited above, which must control us in the consideration of causes such as this one.
From what has been said it follows not only that there was no error in that of which the defendants complain, but also that there was error in that of which the plaintiffs complain — the vacating of the order of arrest as to W. J. Maddrey.
It is true that one partner cannot be arrested for the fraud of his copartner of which he had no knowledge and at which he in nowise connived.McNeely v. Haynes, 76 N.C. 122. Hence if upon the retrial *Page 71 
of the issue of fraud as to W. J. Maddrey it shall appear that the breach of trust committed by the firm of which he was a member was in fact done by his copartner without his knowledge, assent or connivance, then the order should be vacated as to him. The firm of W. J. Maddrey Son, assumed towards the plaintiffs a fiduciary relation as to the property committed to them under this contract. Did W. J. Maddrey know of this contract? The law presumes that he did. Did he know that the managing partner was disposing of this property and the proceeds of its sale in a manner that was violative of its provisions? Did he assent to or connive at such conduct? When he joined his copartner in the execution of the assignment to S. N. Buxton, trustee, did he know or did he have reasonable ground to believe that by that assignment the firm was transferring to that trustee effects that should have been applied to the use of the plaintiffs? If he had this knowledge the act of misappropriation by his copartner became his act, and his intent to commit a breach of his trust is conclusively presumed for all the purposes of this remedy of arrest and bail (102) from such knowledge and such act.
The instructions which the plaintiffs asked should have been given, while those asked by defendants should have been refused. It is adjudged that there was, in the defendants' appeal, no error. In plaintiffs' appeal it is adjudged that as to W. J. Maddrey there shall be a
New trial.
Cited: Fertilizer Co. v. Little, 118 N.C. 817; Gossler v. Wood,120 N.C. 71, 74; Grocery Co. v. Davis, 132 N.C. 98; Organ Co. v. Snyder,147 N.C. 272; Guano Co. v. Southerland, 75 N.C. 231.